IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CELESTINA KWEICIEN, and GEDIMINAS JUKNA, | ) ) ) | |
| Plaintiffs, | ) ) | No. 15-cv-5692 |
| v. | ) ) | Judge Ronald A. Guzmán |
| MARTHA MEDINA-MALTES, et al. | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

The Court grants Defendants' motion for summary judgment [24]. Civil case terminated.

## STATEMENT

This case concerns plaintiff Celestina Kweicien's challenge to the United States Citizenship and Immigration Service's ("USCIS") denial of her petition to have her husband, Gediminas Jukna ("Jukna"), admitted as a lawful permanent resident by virtue of their marriage.[1]

**I.      Statutory and Regulatory Framework**

A United States citizen who seeks lawful permanent resident status for a spouse/foreign national must file a petition (Form I-130) with USCIS. 8 U.S.C. § 1154(a)(1)(A)(i); 8 C.F.R. § 204.1(a)(1). Form I-130 provides USCIS with an opportunity to investigate the claimed marriage, and, if granted, establishes a "formal relationship" between the petitioner and the beneficiary. *Akram v. Holder*, 721 F.3d 853, 83 (7th Cir. 2013). That relationship, in turn, qualifies the beneficiary as eligible for certain immigration visas as an "immediate relative" of a

---

[1] Because Ms. Kweicien originally filed the petition on her husband's behalf, and they both bring the same challenge to USCIS's decision, the Court will use the singular term "Plaintiff" for narrative ease.

United States citizen. *Id.* USCIS may not, however, consider the alien's (separate) application to "adjust status" until it first recognizes the validity of the underlying marriage. 8 U.S.C. §§ 1125, 1151(b)(2)(A)(i), 1154.

In that respect, USCIS is categorically barred from recognizing a marriage under certain circumstances, such as marriage fraud:

> [N]o petition shall be approved if (1) the alien has previously been accorded, or has sought to be accorded, an immediate relative or preference status as the spouse of a citizen of the United States or the spouse of an alien lawfully admitted for permanent residence, by reason of a marriage determined by the Attorney General to have been entered into for the purpose of evading the immigration laws, or (2) the Attorney General has determined that the alien has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws.

8 U.S.C. § 1154(c). The authority to decide issues of marriage fraud in this context has been delegated to USCIS for initial review, *see* 8.C.F.R. § 100.1, and to the Board of Immigration Appeals ("BIA"), which generally issues the final agency decision, *see* 8 C.F.R. § 1003.1(d)(7).

## II. Background[2]

**(A)** *Jukna and His Marriages*

Jukna is a Lithuanian native and citizen. (Defs.' Facts [Dkt. # 36] ¶¶ 1-2.) He entered the United States in 2001 on a B1/B2 visitor visa and married Samantha Crawford ("Ms. Crawford") on February 1, 2005. (*Id.*) This would be the first of his three marriages in the United States.

Three weeks after they married, Ms. Crawford filed an I-130 petition with USCIS, seeking to classify Jukna as an immediate relative of a U.S. citizen. (*Id.* ¶ 4.) But Jukna and Ms. Crawford failed to appear for the scheduled hearing/interview with USCIS (set for September 28, 2005), and they divorced within the next year, on July 28, 2006. (*Id.* ¶¶ 5-6.) Accordingly, on October 25, 2010, USCIS denied Ms. Crawford's I-130 petition, finding that the marriage had

---

[2] The following facts are undisputed unless otherwise noted.

dissolved on July 28, 2006 and that there was insufficient evidence to support her claim of a *bona fide* relationship between her and Jukna. (*Id.* ¶ 7.)[3]

Jukna met his second wife, Andrea Jimenez ("Ms. Jimenez"), two months later at a New Year's party, in December 2010. (*Id.* ¶¶ 8-9.) They married on May 15, 2011, and were divorced by April 19, 2012. (*Id.* ¶¶ 8-10.) The judgment of dissolution of marriage indicates that Jukna and Ms. Jimenez began living separately in June 2011, just one month after they became husband and wife. (*Id.*) Ten days prior to divorcing Ms. Jimenez, however, Jukna was placed into removal proceedings. (*Id.* ¶ 11.)

Jukna married his third wife (Plaintiff) on July 18, 2012, shortly after the removal proceedings were initiated. (*Id.* ¶ 12.) Like Ms. Crawford, Plaintiff filed an I-130 petition on Jukna's behalf. (*Id.* ¶ 13.) In support of the petition, she filed a number of Jukna's tax returns, medical bills, and a copy of a lease. (*Id.* ¶ 14.) With the exception of the tax returns from 2005-2012, the documents provided evidence of Jukna's relationship with Plaintiff, but they did not establish his relationship with his prior wives (beyond marriage certificates and divorce judgments). (*Id.*)

**(B)** *USCIS's Interview and Investigation*

Jukna's interview was held on July 23, 2013. (*Id.* ¶ 15.) There, Jukna provided details about his arrival into the United States in 2001, his employment history, and places he had lived. (*Id.* ¶ 16.) He was unable to remember the exact date of his marriage to his first wife (Ms. Crawford), but claimed they married in 2004. (*Id.* ¶ 17.) (They actually married in 2005, *id.*) He did, however, recall that she worked at a hospital in some capacity, although he was unable to describe her duties. (*Id.* ¶ 18.) When asked about Ms. Crawford's family, Jukna asserted that her

---

[3] The parties' briefing is silent about why the application took so long to adjudicate, but this gap is irrelevant to the foregoing analysis.

parents' names were Michelle and John. (*Id.* ¶ 19.) (Ms. Crawford's father's actual name is Tony, *id.* ¶ 20.)

In terms of his life with Ms. Crawford, Jukna was unable to recall what bills the two shared during their marriage. (*Id.* ¶ 21.) He also stated that Ms. Crawford had only one child from a previous relationship. (*Id.* ¶ 22.) Yet, when he was confronted with information that she had a second child in February 2006 — conceived during the duration of their marriage — Jukna stated that Ms. Crawford had drinking problems and that they were not sleeping together at the time. (*Id.* ¶ 23.)

Regarding his first I-130 petition and the missed USCIS interview, Jukna explained that he and Ms. Crawford did not appear because they were already separated. (*Id.* ¶ 26.) That I-130 petition, moreover, stated that Jukna and Ms. Crawford lived together in Lemont, Illinois for about 4-5 months after marrying (from February 2005 through June or July 2005), whereas on April 1, 2005, Ms. Crawford filed a police report (for an unrelated incident) that listed her address as 1616 N. Poplar Avenue, Round Lake, Illinois (*Id.* ¶¶ 36-39.) This latter address was also reported as the residence of Douglass Whitt, Jr. ("Mr. Whitt"), who is listed as the father of Ms. Crawford's second child on the birth certificate. (*Id.*)

Turning to questions about his own family, Jukna stated that they were non-immigrant visa "overstays" and that his mother and sister were placed in removal proceedings because they did not pass the interview. (*Id.* ¶ 27-28.) He further noted that his mother had married another United States citizen, John Garcia ("Mr. Garcia"). (*Id.* ¶ 29.) Mr. Garcia, however, previously informed USCIS of some significant details: he stated in 2005 that his marriage to Jukna's mother was fraudulent and that they married only to "help her stay in America" and because she

paid him. (*Id.* ¶ 40.) He further claimed that Ms. Crawford's marriage to Jukna was similarly fraudulent. (*Id.*)

Lastly, concerning Jukna's second wife, Ms. Jimenez, Jukna wavered on when exactly they were married, initially stating that he married her on May 5, 2010 but later claiming that they married in 2011. (*Id.* ¶ 30.) Jukna further noted that Ms. Jimenez did not move in with him; she was instead a "long term guest" who kept her own apartment. (*Id.* ¶ 32.)

**(C)** *USCIS's Notice of Intent to Deny the I-130 Petition*

On July 24, 2013, USCIS issued a Notice of Intent to Deny Petition for Alien Relative ("NOID"). (*Id.* ¶ 41.) In the six-page NOID, USCIS summarized the above evidence and concluded that Jukna's marriage to Ms. Crawford was fraudulent, largely because of (1) the inconsistencies of Jukna's testimony with the record, (2) Jukna's inability to recall pertinent details of the relationship, (3) Ms. Crawford's likely relationship with her *actual* partner, Mr. Whitt, and (4) the allegations of fraud by Mr. Garcia. (*Id.* ¶¶ 42-51.)[4] The NOID further expressed doubt about the validity of Jukna's marriage to Ms. Jiminez, noting that it "appears to also have been fraudulent," in part because Jukna was put into removal proceedings in April 9, 2012, only to divorce Ms. Jiminez a few days later and marry Plaintiff shortly after. (*Id.* ¶ 52.) Accordingly, USCIS concluded that Jukna had entered into multiple sham marriages, at least one of which (with Ms. Crawford) was entered into solely for the purpose of evading immigration laws. (*Id.* ¶ 53.)

---

[4] Plaintiff disputes paragraph 45 but offers no record support for the denial, so this fact is accordingly deemed admitted, as it is supported by the record. *See* L.R. 56.1 (requiring that a party who disputes a fact must make "specific reference" to exhibits supporting the denial).

**(D)** *USCIS's Decision Denying the Petition*

Despite its findings, USCIS gave Plaintiff an opportunity to provide evidence to the contrary. (*Id* ¶ 54.) Plaintiff thus submitted a brief through counsel, arguing that USCIS's conclusion was based on mere speculation and unsupported allegations. (*Id.* ¶ 56.) Particularly, she claimed that USCIS erred by focusing on Jukna's inability to answer "trivial" questions and that it was "completely unjust" to credit Mr. Garcia's allegations of fraud. (*Id.*). In USCIS's view, however, Plaintiff failed to provide any additional evidence that Jukna's marriage to Ms. Crawford was not fraudulent. (*Id.* ¶ 57.)

As such, on September 5, 2013, USCIS issued a four-page letter denying Plaintiff's I-130 petition, addressing the issues she raised in her brief as follows:

> USCIS notes that the beneficiary's marriage occurred on February 1, 2005. During the interview on July 24, 2013, USCIS questioned the beneficiary regarding the events that occurred in his life dating back to when he first entered the U.S. in 2001. The beneficiary was able to correctly answer how he entered the U.S., when he entered the U.S. and where he lived in the U.S. prior to February 1, 2005. Furthermore, the beneficiary was able to provide the specific names of companies he had worked for and the specific address for each residence he had lived at prior to February 1, 2005. USCIS finds your attorneys [sic] claims of the beneficiary being unable to remember information about his ex-wife unconvincing.

(*Id.* ¶¶ 57-58.) The denial letter further noted that Plaintiff had not provided any additional evidence to support the claim that Jukna's marriage to Ms. Crawford was in good faith. (*Id.* ¶ 59.)

**(E)** *The Board of Immigration Appeals' Denial*

Unhappy with USCIS's decision, Plaintiff filed an appeal with the BIA. (*Id.* ¶ 60.) She argued that USCIS's ruling was erroneous because the record lacked "substantial and probative evidence" that Jukna's prior marriage was not *bona fide*. (*Id.*) The BIA, upon *de novo* review, rejected her argument, dismissed the appeal, and affirmed USCIS's decision, concluding that the

record contained evidence that the marriage to Ms. Crawford was fraudulently entered into because Ms. Crawford needed money and Jukna needed permanent residency. (*Id.* ¶ 62.) Moreover, the BIA found that based on Mr. Garcia's statements and the other reason in USCIS's denial letter, Plaintiff had "failed to establish that the marriage was valid from its inception." (*Id.* ¶ 63.) Plaintiff's appeal to this Court soon followed.

## LEGAL STANDARD

### I. Administrative Review

The Administrative Procedure Act ("APA") governs this Court's review of a final decision by the BIA. 5 U.S.C. §§ 702, 704. Under the APA, review is limited to the administrative record, and courts must uphold the BIA's findings of fact so long as they are supported by substantial evidence. 5 U.S.C. § 706. A decision is supported by "substantial evidence" if a reasonable mind could find adequate support for the given conclusion based on the record as a whole. *Kepple v. Massanari,* 268 F.3d 513, 516 (7th Cir. 2001). Under this deferential standard, "the scope of review . . . is narrow, and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

### II. The Marriage Fraud Bar

To find a marriage fraudulent, the government must identify "substantial and probative evidence" that the marriage was a sham from its inception. *Surganova v. Holder*, 612 F.3d 901, 904 (7th Cir. 2010); *Matter of Tawfik*, 20 I&N Dec. 166, 170 (BIA 1990); *Cassell v. Napolitano*, 2014 U.S. Dist. LEXIS 42766, at *36-38 (N.D. Ill. 2014). There must be affirmative evidence that creates more than a "reasonable inference" of fraud. *Tawfik*, 20 I&N Dec. at 167-68; 8 C.F.R. § 204.2(a)(1)(ii). The burden rests initially on the government, and a finding of fraud requires more than a finding that a couple failed to prove that their marriage is *bona fide*. *Id*. If

the government identifies substantial and probative evidence that a marriage is fraudulent, the burden then shifts to the petitioner to show otherwise. *Matter of Kahy*, 19 I&N Dec. 803, 806-07 (BIA 1988); *see also Cassell*, 2014 U.S. Dist. LEXIS 42766 at *36-38 (citing *Brown v. Napolitano*, 391 Fed. App'x. 346, 349-51 (5th Cir. 2010)).

## ANALYSIS

Since the BIA is under a statutory obligation to deny an I-130 petition if it determines that the alien previously entered into a fraudulent marriage in order to receive immigration benefits, the determinative issue here is whether there was substantial evidence that Jukna's marriage to Ms. Crawford was a sham designed to circumvent immigration laws.

**I.     The Record Supports the BIA's Finding of Marriage Fraud**

The thrust of Plaintiff's argument on appeal is that the BIA erred in finding "substantial and probative evidence" of marriage fraud, and she devotes much of her time to offering alternative explanations of the primary bases of the BIA's conclusion; namely, Mr. Garcia's statements, Jukna's inability to recall pertinent details about his relationship with Ms. Crawford, and the multiple inconsistencies in his story, such as Ms. Crawford's relationship with Mr. Whitt and their second child. The Court will address each category in turn.

**(A)**     *Mr. Garcia's Statements*

Plaintiff first argues that the BIA committed reversible error by relying heavily on Mr. Garcia's sworn statements because, on her account, they were mere speculation, which establishes only "an inference" of fraud. (Pl.'s Br. [Dkt. # 33] at 13-16.) But this argument misses the mark, and by a lot.

First, the agency's decision was based on consideration of multiple factors, not just Mr. Garcia's statements, as evidenced by the NOID and the BIA's explanation of its final decision.

Mr. Garcia's statements, moreover, are highly probative. They were given under oath and provided details about Jukna's and his mother's fraudulent marriages. (Defs.' Facts [Dkt. # 36] ¶¶ 86-88.) Particularly, Mr. Garcia noted that he met Ms. Crawford once when they all gathered to take photographs at various locations, which is when she told him that she entered into an arranged marriage with Jukna because she needed the money and had a child with another man. (*Id.*) These statements were further corroborated by other record evidence, such as (1) Ms. Crawford's second child with Mr. Whitt, which was conceived during Jukna's marriage to Ms. Crawford, and (2) the police report filed by Ms. Crawford, which suggested she did not live with Jukna at the time they claimed to be married. Although Plaintiff attempts to explain these points by (a) noting that Mr. Garcia could be lying and (b) pointing to Ms. Crawford's alleged drinking problem and the "issues" she and Jukna were having at the time, such arguments are, at best, a plea to reweigh the evidence considered by the BIA and arrive at a different conclusion, which the Court cannot do. *See Schneider v. Nat'l, Inc. v. Interstate Commerce Comm'n,* 948 F.2d 338, 343 (7th Cir. 1991) (explaining that under the APA, a reviewing court may not substitute its decision for that of the agency; its review is limited to assessing whether the record reasonably supports the agency's conclusion).

Ultimately, Plaintiff was given the opportunity to rebut Mr. Garcia's sworn statements *with evidence*, but instead she articulated the same conclusory argument to the BIA that she raises now — that Mr. Garcia's statements are mere conjecture or unreliable. Accordingly, given the paucity of evidence to rebut Mr. Garcia's statements, as well as their consistency with other record evidence, the Court finds that the agency was well within its discretion to credit those statements as part of its finding. *See Ogbolumani v. Napolitano*, 557 F.3d 729, 735 (7th Cir. 2009) (upholding USCIS's reliance on *unsworn* statements from the petitioner's sister, which

suggested marriage fraud, and noting that the petitioner had offered nothing to undermine the reliability of those statements besides generalized, unsupported allegations that the witness was lying out of spite).

**(B)** *Jukna's Recollection of His Marriage with Ms. Crawford*

Plaintiff next contends that the BIA erred by considering Jukna's inability to recall pertinent details of his marriage with Ms. Crawford to be "substantial and probative evidence" of marriage fraud. On Plaintiff's account, it was unreasonable to expect Jukna to recall "trivial" details of a marriage eight years gone. Moreover, Plaintiff insists, the agency should have realized that Jukna had a bad memory, since he was also unable to recall other "big" details about his life, such as what he studied in college and for how long. But even if true, these points do not undermine the agency's decision.

For starters, it bears emphasizing (again) that the BIA did not rely solely on Jukna's inability to recall or provide evidence of the typical "*bona fides*"[5] of his marriage with Ms. Crawford. If the BIA had done that, then its decision would not stand, since a petitioner's failure to establish the validity of a marriage does not satisfy the agency's initial burden of finding substantial evidence of marriage fraud. *Tawfik*, 20 I&N Dec. at 167-68. But Jukna's failure to recall pertinent details of the marriage was just one piece of the puzzle, and a considerable one.

Jukna was unable to recall what year he married Ms. Crawford, when they separated, or what bills they shared during their marriage. (Defs.' Facts [Dkt. # 36] ¶¶ 21-26.) Nor was he able to recall what Ms. Crawford did for a living (although he knew she worked at a hospital in some

---

[5] *See, e.g.,* 8 C.F.R. § 204.2 (listing examples of documentary evidence of a *bona fide* marriage, such joint expenses or jointly owned property); *see also Agymen v INS*, 296 F.3d 871, 882-83 (9th Cir. 2002) ("Evidence of a marriage's bona fides include: jointly-filed tax returns; shared bank accounts or credit cards . . . documents reflecting joint ownership of [property], . . . and testimony or other evidence of the couple's courtship.").

capacity) or what her father's name was.[6] (*Id.* ¶¶ 18-19.) Perhaps these shortcomings were a product of Jukna's poor memory, but an equally fair inference to be drawn is that Jukna did not know much about Ms. Crawford or their "shared life." Thus, as Plaintiff has cited no principle of law suggesting that Jukna's allegedly faulty memory somehow undermines the BIA's inference in this regard, the Court simply has no basis to overturn it. *See Freeman United Coal Mining Co. v. Stone,* 957 F.2d 360, 362 (7th Cir. 1992) ("[A] reviewing body [under the APA] may not set aside an [agency's] inference merely because it finds the opposite conclusion more reasonable.").

**(C)** *Inconsistencies in Jukna's Statements*

Lastly, Plaintiff makes much of the BIA's emphasis on two glaring inconsistencies between Jukna's testimony and the record: (1) his statements regarding Ms. Crawford's second child; and (2) his statement that he lived with Ms. Crawford in Lemont, Illinois, whereas the police report she filed suggested she lived in Round Lake, Illinois with Mr. Whitt.

In terms of the second child, Plaintiff insists that Jukna's statements were actually consistent with the record. But this argument is difficult to swallow. The hearing transcript says it all:

> Q: Did you and Samantha have any children together?
> A: She had a kid from her previous relationship.
> Q: She just had one child?
> A: Yes.
> Q: Was Samantha pregnant at any time before you separated from her?
> A: No.

(AR [Dkt. # 17] at 74.) Since it is undisputed that Ms. Crawford *was* pregnant with a second child during the duration of her marriage with Jukna, (Defs.' Facts [Dkt. # 36] ¶ 33), Jukna's

---

[6] Plaintiff notes in her brief that Jukna preferred to call Ms. Crawford's father by his nickname "John," but the portion of the record on which she relies (the hearing transcript) does not reflect that. (*See* Pl.'s Br. [Dkt # 33] at 4) (citing Administrative Record ("AR") [Dkt. # 17] at 71).

statements to USCIS can fairly be considered as evidence of his ignorance about significant events in Ms. Crawford's life, which suggests the two did not share one together.

With respect to Ms. Crawford's purported residence and the police report, Plaintiff argues that the BIA erred by finding an inconsistency because "there could be many reasons behind Ms. Crawford's decision to use Round Lake as her address . . . rather than the place she was residing at the time." (Pl.'s Br. [Dkt. # 33] at 24.) Yet this argument is as equally unavailing as the first. Not only does it improperly invite the Court to speculate about different conclusions that could be drawn from the record, *see Schneider,* 948 F.2d at 343, it also ignores the evidence that Mr. Whitt, the father of the second child, was listed at the same Round Lake address that Ms. Crawford gave in the report, (Defs.' Facts [Dkt. # 36] ¶¶ 36-39). These are indeed glaring inconsistencies in Jukna's story, and the BIA did not err by weighing them heavily.

In the end, the Court is cognizant of Plaintiff's repeated assertion that she and Jukna have a *bona fide* marriage. But that marriage has no impact on the BIA's determination on whether Jukna's prior marriage to Ms. Crawford was fraudulent. In that respect, the picture before the BIA was this: Jukna was unable to recall significant details about his shared life with Ms. Crawford, indeed even her *pregnancy*. The record suggests, moreover, that the two did not live together during their marriage, and that Ms. Crawford was instead living with her *actual* partner and father of her child, Mr. Whitt. Combined with the testimony from Mr. Garcia, which Plaintiff has not rebutted, the BIA's finding that Jukna's marriage to Ms. Crawford was fraudulent is certainly supported by substantial evidence.[7] *See Ghaly v. INS*, 48 F.3d 1426, 1431

---

[7] Plaintiff draws the Court's attention to two cases, *Sehgal v. Lynch*, 813 F.3d 1025 (7th Cir. 2016) and *Ogbolumani v. Napolitano*, 557 F.3d 729 (7th Cir. 2009), as metrics for gauging "substantial evidence." In both cases, the Seventh Circuit affirmed the agency's finding of marriage fraud because the petitioning parties *admitted* that a prior marriage was fraudulent. Thus, since there is no similar "smoking gun" here, Plaintiff insists that the Court cannot find

(7th Cir. 1995) (explaining that an agency decision *must* upheld so long as it is a rational conclusion derived from the record); *see also Chevron v. NRDC,* 467 U.S. 837, 843-44 (noting that where Congress has granted power to an agency over certain matters, [such as reviewing immigration claims], that grant of power embodies congressional recognition of the agency's "special competence" to handle those matters, and compels deference from the reviewing court). The Court therefore affirms the BIA's decision and grants Defendants' motion for summary judgment.

---

substantial evidence of marriage fraud, on this record, as a matter of law. But the Court does not share this interpretation of the applicable precedent. The *Sehgal* panel, for example, explained that "the agency had substantial evidence, in the form of [the admissions of fraud], *as well as the inconsistencies found in the original investigation of [the] marriage*," 813 F.3d at 1032 (emphasis added), which suggests that a finding of marriage fraud may be grounded upon record inconsistencies alone. And here, as noted above, the BIA had a lot more than mere inconsistencies to ground its conclusion. Moreover, while the Court is hesitant to assign a precise evidentiary value to a party's *admission* of marriage fraud, it likely falls closer to "conclusive evidence" than "substantial evidence," and imposing the former quantum of proof upon the BIA would be inconsistent with the APA and well-established principles of administrative review. *See CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 675 (7th Cir. 2001) ("Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted).

## **CONCLUSION**

For the reasons set forth above, the Court grants Defendants' motion for summary judgment [24]. Civil case terminated.


SO ORDERED.                                            ENTERED: October 20, 2016


_____
**HON. RONALD A. GUZMÁN**
**United States District Judge**